**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X

SECURITIES AND EXCHANGE  :
COMMISSION,      :
    Plaintiff,  :  03 Civ. 177 (JFK)
  -against-    :  **OPINION AND ORDER**
          :
PAUL E. JOHNSON,    :
    Defendant.  :
------------------------------X

<u>APPEARANCES</u>:

    For Plaintiff Securities and Exchange Commission:

      Securities & Exchange Commission
      Donald N. Dowie
      Stacey M. Nahrwold
      U.S. Securities & Exchange Commission
      450 Fifth Street, N.W.
      Washington, D.C. 20549-0911


    For Defendant Paul E. Johnson:

      Paul, Weiss, Rifkind, Wharton & Garrison LLP
      Mark F. Pomerantz, Esq.
      Eric S. Goldstein, Esq.
      Douglas M. Pravda, Esq.
      1285 Avenue of the Americas
      New York, NY 10019-6064

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge**

This is the final judgment in a civil securities fraud case.  Following a November 11, 2005 jury verdict finding the Defendant Paul Johnson ("Johnson") liable on four counts of securities fraud, the Securities and Exchange Commission ("SEC") has moved for a permanent injunction, $2,405,230 of disgorgement with prejudgment interest, and $2,405,230 in civil penalties.  On March 24, 2005, the Court denied the Defendant's motion for summary judgment. S.E.C. v. Johnson, No. 03 Civ 177, 2005 WL 696891 (S.D.N.Y. Mar. 24, 2005).  On January 31, 2006, the Court denied Defendant's motion to set aside the verdict or, in the alternative, for a new trial. SEC v. Johnson, No. 03 Civ. 177, 2006 WL 238998 (S.D.N.Y. Jan. 31, 2006)

Johnson argues that the Court should not impose an injunction, order disgorgement, or impose civil penalties. However, in the event the Court deems disgorgement appropriate, Johnson claims the amount proposed by the SEC should be significantly limited.  If the Court decides to order civil penalties, Johnson argues the penalties should be limited to $25,000.

The Court finds the SEC's proposals to be too severe and Johnson's proposals too mild.  Giving adequate deference to the jury's verdict and taking into account other factors discussed below that warrant some leniency for Johnson, the Court

orders the more appropriate remedy of a five-year injunction, $1,868,796 of disgorgement and prejudgment interest thereon, and $125,000 in civil penalties.

Following the Court's Opinion, set forth below, the Court has annexed its Final Judgment.

**Background**

## I. Johnson's Conduct

The SEC had charged Johnson, a former research analyst with the firm of Robertson Stephens, with issuing false and misleading research reports and public statements about three companies: Corvis, Redback, and Sycamore. According to the SEC, Johnson's actions with regard to these companies violated the Exchange Act of § 10(b), 15 U.S.C. § 78j(b) ("§ 10(b)"), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5 ("10b-5"), and with regard just to Corvis also violated the Securities Act § 17(a), 15 U.S.C. § 77q(a) ("§ 17(a)").

### A. Corvis

Beginning in November 1999, Bayview, an employee investment fund at Robertson Stephens, invested approximately $5 million in Corvis stock, of which approximately $90,000 represented Johnson's personal investment. Bayview signed lockup agreements in June 2000, prohibiting Bayview from selling the Corvis shares until 180 days after Corvis's anticipated initial public offering ("IPO"). Corvis went public on July 27, 2000.

In August 2000, Johnson reported on Corvis, calling it a "buy." Johnson reiterated this view in an October 2000 research report. Neither report disclosed that Johnson had a personal interest in Corvis. These first two research reports are mentioned in the complaint as background, but are not specifically charged as violations of the securities laws. (Compl. ¶¶ 28, 34.)

According to the complaint, Johnson first acted with scienter when he told investors in a January 16, 2001 research report that Corvis was a "buy," while privately recommending to members of his firm at a January 23, 2001 Bayview meeting that they sell their holdings when the lock-up period expired the next day, January 24, 2001. (Compl. ¶¶ 29, 30, 34.) Though her memory of the meeting was not crystal clear, a witness testified that Johnson may have stated at the meeting that he would not buy at Corvis's current price but would be a buyer at twelve to fourteen dollars -- about half of the market price at the time.

On January 24, 2001, Johnson sold all of his Corvis shares, realizing a profit of $127,987. Johnson publicly disclosed his sale by filing a Form 144 statement with the SEC. In a January 26, 2001 research report, Johnson again rated Corvis a "buy," and did not disclose his own sale of Corvis shares or his seemingly contradictory statements at the Bayview meeting. At trial, Johnson claimed he sold his Corvis shares because he

4

needed cash liquidity.

**B.  <u>Redback</u>**

In March 1999, Johnson purchased $50,000 worth of shares from Siara, a private company.  In June 1999, Johnson issued a research report, in which he rated the public company, Redback, a "buy."

On November 29, 1999, Redback announced its intent to acquire Siara in a stock transition.  On the same day, Johnson issued a research report, rating Redback a "strong buy" and speaking favorably of Redback's upcoming merger with Siara.

The next day, on November 30, 1999, Johnson issued another research report on Redback, continuing to speak favorably of the Redback-Siara merger.  Robertson Stephens issued a press release, which Johnson approved, publicizing Johnson's support of the merger.  The reports and press release failed to disclose that Johnson owned Siara stock.

When the merger finally closed in March 2000, Johnson's Siara stock was converted to Redback stock with a value of nearly $10 million.  In December 2000, at the demand of Robertson Stephens, Johnson deposited his Redback shares into a trust account.

**C.  <u>Sycamore</u>**

In November 1999, Johnson issued a research report, rating Sycamore a "buy."  About 3 months later, in February 2000,

Johnson invested $75,000 in the private company, Sirocco.  On
June 6, 2000, Sycamore announced it would acquire Sirocco.  Also
on June 6, Johnson issued a research report on Sycamore praising
the merger, and he made an appearance on CNNfn's Market Coverage
television show, in which he recommended the stock to viewers.
Neither the reports nor the appearance disclosed Johnson's
ownership of Siara stock.

    The merger closed on September 7, 2000, making
Johnson's converted Sycamore shares worth approximately $2.2
million.  Johnson realized $555,567 of this paper profit by
selling 10,000 of his Sycamore shares on December 5, 2000.
Johnson claimed at trial that he needed the money to cover a
$600,000 check he had written for the down payment on his
Manhattan apartment.

## II.  **The Jury Verdict**

    The jury was charged as to § 10(b), and Rule 10b-5.[1]
To establish a cause of action under § 10(b) or 10b-5, a
plaintiff must show "(1) in connection with the purchase or sale
of a security; (2) defendant, acting with scienter; (3) made a
material misrepresentation or (where there exists a duty to

---

[1] The SEC's complaint alleged violations of the Exchange Act,
§ 10(b), Rule 10b-5 promulgated thereunder, and the Securities
Act, § 17(a).  The jury was not charged as to § 17(a).  Whether
Johnson violated § 17(a) is a decision reserved for the Court; a
decision the Court makes in Part I of the Discussion section of
this opinion.

speak) a material omission."  Press v. Quick & Reilly, Inc., 218
F.3d 121, 129 (2d Cir. 2000).

The jury found by a fair preponderance of the evidence
that Johnson made omissions and misrepresentations that were
material in the eyes of a reasonable investor and that Johnson
acted with scienter when he failed to adequately disclose his
interest in companies he covered in research reports.  The jury
answered affirmatively the four special interrogatories posed by
the Court:

> 1.  Has the S.E.C. established by a fair preponderance of
> the evidence that Paul Johnson violated the federal
> securities laws in accordance with my charge by
> fraudulently omitting material facts as to Redback?
>
> 2.  Has the S.E.C. established by a fair preponderance of
> the evidence that Paul Johnson violated the federal
> securities laws in accordance with my charge by
> fraudulently omitting material facts as to Sycamore?
>
> 3.  Has the S.E.C. established by a fair preponderance of
> the evidence that Paul Johnson violated the federal
> securities laws in accordance with my charge by
> fraudulently omitting material facts as to his sale of
> Corvis stock?
>
> 4.  Has the S.E.C. established by a fair preponderance of
> the evidence that Paul Johnson violated the federal
> securities laws in accordance with my charge by
> fraudulently misstating material facts as to his
> investment opinion of Corvis stock?

(Tr. 1254-55.)

III.  **Motion to Set Aside the Verdict**

Following the trial, Johnson made a motion to set aside
the verdict and grant judgment on the law or, in the alternative,

for a new trial. In its decision, the Court referred to the case as a "close call," but noted that a "close call is not tantamount to a 'miscarriage of justice' or a 'seriously erroneous result,'" the applicable legal standards for the relief Johnson sought. <u>SEC v. Johnson</u>, No. 03 Civ. 177, 2006 WL 238998 (S.D.N.Y. Jan. 31, 2006). The Court, "[g]iven Plaintiff's preponderance of the evidence burden in this securities fraud case and the high standards by which the Court is bound when reviewing jury verdicts," denied the motion. <u>Id.</u>

## Discussion

### I. Johnson's Liability

The jury found Johnson liable for violating § 10(b) and Rule 10b-5 as to Redback, Sycamore, and Corvis. The complaint also contains a claim for relief under § 17(a). The jury was not charged with regard to § 17(a) because the claim brought under § 17(a) -- that Johnson violated § 17(a) by fraudulently omitting or misstating material facts in connection with his sale of Corvis stock -- sounds only in equity.[2]

---

[2] The only non-equitable claim in this case is Plaintiff's claim for civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3) ("78u(d)(3)"). 78u(d)(3) applies to violations of Chapter 2B in Title 15. The Securities and Exchange Act of 1934, which includes § 10(b), is found in Chapter 2B. However, the Securities Act of 1933, where § 17(a) is located, is not included in Chapter 2B, but instead is found in Chapter 2A of Title 15. According to the complaint, civil penalties were only sought with regard to § 10(b). Therefore, the only question at law for the jury's determination was whether the Defendant violated § 10(b) and Rule 10b-5.

When deciding equity claims, the judge is bound by the jury's findings on the at-law claims to the extent they overlap with the equity claims. <u>Dairy Queen, Inc. V. Wood</u>, 369 U.S. 469, 479-80 (1962); <u>Song v. Ives Laboratories, Inc.</u>, 957 F.2d 1041, 1048 (2d Cir. 1992); <u>Marshall v. Nelson Elec.</u>, 766 F.Supp 1018, 1025 (N.D. Okl. 1991), <u>aff'd</u>, 999 F.2d 547 (10th Cir. 1993).

The elements of § 10(b) and § 17(a) are essentially identical. <u>SEC v. Monarch Funding Group</u>, 192 F.3d 295, 308 (2d Cir. 1999); <u>SEC v. First Jersey Securities</u>, 101 F.3d 1450, 1467 (2d Cir. 1996), <u>cert.</u> <u>denied</u>, 522 U.S. 812 (1997). Section 17(a), however, applies only to sellers of securities, whereas § 10(b) applies more broadly to purchasers as well as sellers. <u>SEC v. Namer</u>, No. 97 Civ. 2085, 2004 WL 2199471 (S.D.N.Y. Sept. 30, 2004). In addition, though § 17(a)(1) requires proof of scienter, 17(a)(2) and (3) require only proof of negligence.

The SEC's complaint in this case does not allege negligence. Therefore, the § 17(a) elements at issue in this case are functionally identical to the § 10(b) elements, on which the jury found Johnson liable. The Court, bound by the jury's findings of fact, finds Johnson liable for violating § 17(a).

Having established Johnson's liability for violating § 10(b) and § 17(a), the Court turns to a discussion of the appropriate remedies for these violations.

## II.  Remedies

### A.  Injunction

A judge may issue a permanent injunction where the SEC makes a proper showing that an injunction is appropriate.  "In order to make such a showing, the SEC must demonstrate by a preponderance of the evidence that there is a 'reasonable likelihood[3] that the wrong will be repeated.'" SEC v. Hasho, 784 F. Supp. 1059, 1110-11 (S.D.N.Y. 1992) (quoting SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100-01 (2d Cir.1972)). Because injunctive relief causes serious consequences, "the Second Circuit has placed emphasis on the need of the SEC to prove more than the mere fact of past violations, but also a realistic likelihood of recurrence." Id. at 1111 (citing SEC v. Commonwealth Chemical, 574 F.2d 90, 100 (2d Cir. 1978)).

The Second Circuit has specified several factors courts may consider in determining whether an injunction is appropriate, such as: the degree of scienter involved; the sincerity of the defendant's assurances against future violations; the isolated or recurrent nature of the infraction(s); the defendant's

---

[3] The SEC incorrectly states this standard in its briefs. The SEC states that it must prove a "substantial likelihood" that the defendant will violate the securities laws in the future. The "substantial likelihood" standard applies to motions for preliminary injunction, not permanent injunction.  Hasho, 784 F. Supp. at 1110, note 12 (citing SEC v. Unifund SAL, 910 F.2d 1028, 1039-40 (2d Cir.1990)).  For a permanent injunction, the SEC must only prove a "reasonable likelihood."

recognition of his wrongful conduct; and/or the likelihood, because of defendant's occupation, that future violations might occur.  Id.  A court may also consider the adverse impact an injunction would have on a defendant's career.  Manor, 458 F.2d at 1102.

"As a general matter, a court operates with broad discretion when fashioning equitable relief." Lacks v. Fahmin, 623 F.2d 254, 256 (2d Cir. 1980).  To determine whether a permanent injunction is warranted, a "'district court is called upon to assess all those considerations of fairness that have been the traditional concerns of equity courts.'" Hasho, 784 F. Supp. at 1110 (quoting Manor, 458 F.2d at 1100-01).

1.  **Scienter**

The exact degree of scienter found by the jury is unknown.  The Court charged the jury that Johnson acted with scienter if he "acted knowingly with intent to defraud or recklessly." (emphasis added.)

The SEC claims that implicit in the jury's decision is a finding that Johnson's degree of scienter was high.  With regard to Corvis, the jury found Johnson liable for a material misstatement, as well as the omission of material facts.  According to the SEC, a material misstatement necessarily indicates a higher level of scienter than an omission.  With regard to Redback and Sycamore, by omitting material facts, the

SEC argues that the jury must have found that Johnson acted with, at least, recklessness. The Court agrees, as applied to this case, that the material misstatement for which the jury found Johnson liable, in comparison with the Johnson's omissions, indicates a higher level of scienter.

Johnson contends that his level of scienter was too low to warrant an injunction. An injunction, he argues, is a drastic remedy "reserved for willful lawbreakers or those whose operations are so extremely or persistently sloppy as to pose a continuing danger to the investing public." SEC v. Steadmen, 967 F.2d 636, 648 (D.C. Cir. 1992). Johnson claims his violations were not this egregious. In support, he cites language from this Court's decision denying him a new trial or judgment notwithstanding the verdict, in which the Court refers to the case as a "close call." Indeed, this case was a close call. The jury, however, chose to call it in favor of the SEC, not Johnson.

Johnson also cites language from the SEC's closing arguments in which the SEC stated that Johnson's actions "personified recklessness," (Tr at 1167-68), instead of saying his actions personified intentional misconduct. However, the sentence preceding the one cited by Johnson from the SEC's closing argument states that "the SEC does not have to prove that [Johnson] intentionally committed securities fraud, though, we suggest the evidence shows he did that with respect to" Sycamore,

Redback, and Corvis. (Tr. 1167.)

Regardless, the Court clearly stated in its jury charge that "[i]f an attorney has stated a legal principle different from any that I state to you in my instruction, it is my instructions that you must follow." (Tr. 1212.)  The judge's instructions, as already stated in this decision, informed the jury that scienter could be established by either recklessness or knowledge.

Johnson also argues that the evidence adduced at trial demonstrated that the non-disclosure in his Redback, Sycamore, and Corvis reports was not "the result of an egregious intent to defraud, but instead was consistent with the direction he received from his employer . . . ." (Mem. L. 15.)  The jury, however, rejected Johnson's good faith reliance on his employer as a defense and found Johnson liable. (Tr. 1223-34)

Johnson also makes the point that this litigation was a "first litigation."  Johnson acknowledges that it was appropriate for the SEC to bring a "first litigation," but that "[i]t is very different – and, we submit, grossly unfair – to conclude that a defendant, such as Mr. Johnson, who conducted himself in accordance with the industry norms at the time, is the type of 'willful lawbreaker[]' anticipated by Steadman, [967 F.2d at 648]."

The jury, however, was not persuaded that industry

custom relieved Johnson of liability. (Tr. 1222.)  As this Court found in its decision denying Johnson's motion to set aside the verdict, the jury's conclusion was reasonable. <u>SEC v. Johnson</u>, 2006 WL 238998 (S.D.N.Y. January 31, 2006).

Nonetheless, the Court will give the fact that this was a "first litigation" some limited weight in fashioning equitable relief in this case because it feels that making one person pay too high a price for what was an industry norm is unfair.

With regard to Corvis, Johnson argues against a high level of scienter because the jury's finding that Johnson made material misstatements was based on the testimony of a single witness.  This may or may not be true.  Only the jury knows whether there was additional evidence, direct or circumstantial, on which it relied.  Regardless, this argument ignores the fact that the jury was properly instructed that "the weight of evidence is not necessarily determined by the number of witnesses . . . ." (Tr. 1209.)  Following this instruction, the jury, as is its prerogative, <u>Metromedia Co. V. Fugazy</u>, 983 F.2d 350, 363 (2d Cir. 1992), presumably chose to credit the testimony of this single witness by finding Johnson liable.

As is probably evident from the discussion above, the scienter factor weighs in favor of the SEC.

## 2. Sincerity of Defendant's Assurances Against Future Violations & Defendant's Recognition of His Wrongful Conduct

For the sake of brevity, the Court has combined these two factors. Johnson has made no assurances against future violations nor has he stated to the Court that he recognizes his wrongful conduct. According to Johnson, he should not be penalized for simply mounting a vigorous defense in both the trial and injunctive relief stage of the proceedings against him. Johnson also argues that "as this was a 'first litigation' that sought to penalize Johnson for conduct which the then-applicable rules did not clearly prohibit . . . , Mr. Johnson had every reason to mount a strong defense to those novel charges."

The Court agrees with Johnson. As the District of Columbia Circuit stated in SEC v. First City Financial Corp., 890 F.2d 1215, 1229 (D.C. Cir. 1989):

> The securities laws do not require defendants to behave like Uriah Heep in order to avoid injunctions. They are not to be punished because they vigorously contest the government's accusations. We think "lack of remorse" is relevant only where defendants have previously violated court orders, or otherwise indicate that they did not feel bound by the law. As such, it is really only another indication as to whether it is "reasonably likely" that future violations will occur in the absence of an injunction.

Id. (internal citations omitted). The Court agrees with the reasoning of the D.C. Circuit. These two factors do not control

the Court's determination of whether an injunction is appropriate
in this particular case.

### 3.   Isolated or Recurrent Nature of Infraction(s)

The SEC claims that the violations occurred repeatedly
and were not isolated in nature.  Johnson claims to the contrary
that "[t]he circumstances of this case represent isolated
occurrences, which took place more than six years ago, in a long
and otherwise untainted professional career."  It is true that
the occurrences took place more than six years ago and that
Johnson, as far as the Court knows, has an otherwise untainted
professional career.  However, the occurrences took place over a
span of several years with regard to three different companies.
The jury found Johnson liable for four violations of securities
fraud.

This factor weighs in favor of the SEC.

### 4.   Likelihood, Because of Defendant's Occupation, That Future Violations May Occur

Johnson argues that the likelihood of future violations
is low because Johnson no longer works as a securities analyst
and it is unlikely he will ever work in that capacity again.  The
SEC contends that, although Johnson is no longer a research
analyst, Johnson's present position as a hedge fund manager

"places him in a position to once again violate the federal
securities laws." (Mem. L. 14.)

The Court is persuaded that Johnson's occupation as a
hedge fund manager makes it likely that future violations may
occur.  Though the law with regard to hedge funds is currently in
a state of flux, as a hedge fund manager, Johnson is at risk of
being the subject of an action brought under the anti-fraud
provisions of the federal securities laws. See, e.g., Goldstein
v. SEC, 2006 WL 1715766 (D.C. Cir. June 23, 2006) (rejecting
SEC's hedge fund registration rule); Abrahamson v. Fleschner, 568
F.2d 862, 869 (2d Cir. 1977) (finding the anti-fraud provisions
applicable to a hedge fund general partner); United States v.
Berger, 188 F. Supp. 2d 307 (S.D.N.Y. 2002) (denying hedge fund
manager's motion to withdraw his guilty plea in a § 10(b)
action).

The Court finds that this factor weighs in favor of the
SEC.

### 5.   <u>Adverse Impact on Defendant's Career</u>

According to Johnson, he has lost business as result of
the adverse jury verdict in this case and can no longer find a
job as a securities analyst.  As such, Johnson says he has
suffered enough.  An injunction, he claims could have further
administrative consequences, which would further curtail his
ability to make a living.

The Court finds this argument persuasive, but not powerful enough to overcome the factors examined above that weigh in favor of imposing an injunction. The Court does believe, however, that the misconduct at issue here, considering the adverse impact on Johnson's career in conjunction with the context of this case as a "first litigation," warrants an injunction that is not permanent. The Court finds a lifetime injunction to be too harsh a remedy and somewhat unfair. See SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100-01 (2d Cir. 1972) (calling on courts to consider fairness when determining whether to grant an injunction). Instead, the Court will impose a five-year injunction upon Johnson.[4] See State of Nebraska Dept. of Health and Human Services v. Department of Health and Human Services, 435 F.3d 326, 330 (D.C. Cir. 2006) (Ginsburg, J.) ("An injunction must be narrowly tailored to remedy the specific harm shown." (internal quotations omitted)). The terms of the injunction are annexed hereto in the Court's Final Judgment.

### B. Disgorgement

_____

[4] The SEC requested an injunction against Johnson as well as "his agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this judgment by personal service or otherwise." (Proposed Final Judgment.) The SEC's complaint, however, only seeks an injunction against Johnson. (Compl. p.13 subsection (i)). The Court finds an injunction against anyone other than Johnson to be overly broad, as only Johnson was the subject of this litigation. See State of Nebraska Dept. of Health and Human Services v. Department of Health and Human Services, 435 F.3d 326, 330 (D.C. Cir. 2006) (Ginsburg, J.).

Disgorgement "'is a method of forcing a defendant to give up the amount by which he was unjustly enriched.'" SEC v. Inorganic Recycling Corp., 2002 WL 1968341, *2 (S.D.N.Y. Aug. 23, 2002) (quoting SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 102 (2d Cir. 1978)). A Court has the power to order disgorgement of profits "received in connection" with violations of the federal securities laws. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1104 (2d Cir. 1972) (Motley, J.); see also SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989) ("[T]he Court may exercise its equitable power only over property causally related to the wrongdoing.").[5]

The SEC bears the initial burden of persuasion that the amount of disgorgement it seeks approximates the amount by which the defendant was unjustly enriched. See First City, 890 F.2d at 1231; Inorganic, 2002 WL 1968341, at *2. If the SEC makes such a showing, the burden shifts to the defendant to show that the SEC's approximation is inaccurate. Inorganic, 2002 WL 1968341, at *2. After the SEC has met its burden, any discrepancies are settled to the benefit of the SEC. See SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995).

"A district court enjoys broad discretion in fashioning

---

[5] Though from a different jurisdiction, this case is relied on by courts within the Second Circuit. See, e.g., SEC v. Namer, 2006 WL 1541378 (2d Cir. 2006); SEC v. Patel, 61 F.3d 137, 139 (2d Cir. 1994); Inorganic, 2002 WL 1968341, at *2.

a disgorgement remedy." <u>SEC v. Namer</u>, No. 05 Civ. 335, 2006 WL
1541378, *1 (2d Cir. June 1, 2006) (citing <u>SEC v. Lorin</u>, 76 F.3d
458, 462 (2d Cir.1996)).

### 1. <u>Corvis</u>

The SEC, based on the difference between the price at
which Johnson originally bought Corvis and the price at which
Johnson sold his Corvis stock, has calculated $127,987 of
disgorgement for Corvis.  However, the price of Corvis stock had
risen from $6.71 per share (when Johnson bought the stock) to $23
a share on January 12 (the last day of trading before the
misconduct charged in the complaint), an increase of $113,981.

Johnson argues that disgorgement is inappropriate in
this case.  In the alternative, Johnson contends that the dollar
amount proposed by the SEC is too large because it includes
Johnson's $113,981 paper profit on Corvis prior to the date of
the first charged misconduct.  Thus, Johnson avers that "the most
he could be ordered to disgorge is $14,006, the difference
between the $127,987 that the SEC requests . . . and the $113,981
that is entirely unconnected to any fraud."

In the interest of fairness, the Court orders Johnson
to disgorge $14,006; the profits he clearly received in
connection with his charged fraudulent activities concerning
Corvis.

## 2  **Redback**

The SEC seeks $1,755,751 in disgorgement from Johnson which consists of: $1,424,441 from the sale of 43,138 shares of Redback stock from Johnson's trust; plus $381,310 based on the assumption that Johnson still owns 17,000 shares valued at $22.43 per share[6]; minus Johnson's initial investment in Siara of $50,000.

Johnson argues disgorgement is inappropriate because the SEC has not adequately established any causal connection between Johnson's research reports and the price of the stock. The cases Johnson cites to support this proposition are inapposite, as they concern private securities litigation. See DeMarco v. Lehman Bros., 222 F.R.D. 243, 246 (S.D.N.Y. 2004); Hevesi v. Citigroup Inc., 366 F.3d 70 (2d. Cir. 2004).

In addition, Johnson argues that the SEC's pre-trial memorandum only sought disgorgement with regard to Corvis, barring the SEC from seeking disgorgement with regard to Redback. Although the pre-trial memorandum does not seek disgorgement with regard to Redback, the SEC's complaint does (Compl. p.13 subsection (ii)).

The Court does find it unfair, however, to order

---

[6] The SEC calculates the value of these shares based on the "marked-to-market" standard, which means the stock is valued at its most recent price.  As of April 4, 2006, when the SEC finalized its calculations Redback stock was valued at $22.43 per share.

disgorgement based on Johnson's assumed continued ownership of 17,000 Redback shares. The Court does not know whether Johnson still owns these shares. If he sold the shares, the Court does not know when he sold them or at what price. The SEC had ample opportunity to ask Johnson whether he still owned any Redback shares while Johnson was on the stand at trial.

At oral argument, the Court asked why the SEC had not questioned Johnson about these 17,000 shares at trial. The SEC replied that it was not required to try the penalty phase during the liability phase of trial. (Tr. 25.) While that may be true, the SEC could have asked the question or requested a hearing or asked for additional discovery during the penalty phase.

The Court cannot state, with a level of certainty that is fair to Johnson, that he continues to hold these shares and should disgorge profits that, to the Court, are hypothetical. The Court understands that any uncertainty in calculating disgorgement is supposed to fall on the wrongdoer, but in this case the Court finds that the SEC has not met its initial burden of persuading the Court that its approximation reflects the amount by which Johnson was unjustly enriched.[7] The Court orders

_____

[7] To add further context to this decision, the SEC has made several clerical errors throughout this litigation; for example, citing the incorrect statute section in its complaint (the complaint was later amended after the Court made the SEC aware of the error), and submitting a chart in connection with its motion papers that by mistake increased the number of offenses it claimed Johnson had committed. As a result, the Court does not

that Johnson disgorge $1,374,441 with regard to Redback.

### 3. **Sycamore**

The SEC seeks $521,492 of disgorgement for Johnson's Sycamore violations, which consists of: $555,349 from Johnson's sale of 10,000 Sycamore shares; plus $41,143, based on the assumption that Johnson still owns 8,848 shares valued at $4.65 per share[8]; minus Johnson's initial investment in Sirooco of $75,000.

Johnson makes the same arguments with regard to Sycamore that he made with regard to Redback. The Court, in turn, relies on its previous disposition of these arguments in the Redback section above. Accordingly, the Court subtracts the $41,143 for the Sycamore stock the SEC assumes Johnson owns. The Court orders Johnson to disgorge $480,349 with regard to Sycamore.

Adding together the disgorgement amounts set forth above for Corvis, Redback, and Sycamore, the Court orders disgorgement in the total amount of $1,868,796 plus prejudgment interest thereon. See SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 2d

_____

feel comfortable accepting the SEC's guess that the Redback shares remain in Johnson's possession. This is not said to criticize the lawyers at the SEC, but merely to illustrate that people make mistakes, and this Court sitting in equity will not order Johnson to pay where there is no proof he stills holds the shares.

[8] The SEC again uses the "marked-to-market" standard to calculate this price.

Cir. 1998).  As stated previously, the Final Judgment is annexed to this decision.

## C.  <u>Civil Penalties</u>

The Court has authority to impose monetary penalties under 15 U.S.C. § 78u(d)(3)(A) (2006).  Under this section, "the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation."  Three different tiers of penalties apply, depending on the nature of the misconduct at issue.  Only tiers 2 and 3 are at issue here.

Tier 2 specifies that:

> the amount of penalty for each such violation <u>shall not exceed</u> the greater of (I) $50,000 for a natural person or $250,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation  . . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

78u(d)(3)(A)(b)(ii) (emphasis added).  The $50,000 penalty has been adjusted for inflation to $55,000. 17 C.F.R. 201.1001 (1996).

Tier 3 specifies that:

> the amount of penalty for each such violation <u>shall not exceed</u> the greater of (I) $100,000 for a natural person or $500,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation, if . . . the violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and . . . directly or indirectly resulted in substantial losses or

created a significant risk of substantial losses
to other persons.

78u(d)(3)(A)(b)(iii) (emphasis added). The $100,000 penalty has
been adjusted for inflation to $110,000. 17 C.F.R. 201.1001. As
is evident from the language emphasized by the Court, "shall not
exceed," the Court can impose less than the amounts suggested in
subsections (ii) and (iii).

The important difference between the two tiers, other
than the dollar amount, is that tier 3, in addition to requiring
deliberate and reckless conduct, requires that the conduct also
"resulted in substantial losses or created a significant risk of
substantial losses to other persons." 78u(d)(3)(A)(b)(iii).
Because Johnson's reports were intended for and read by highly
sophisticated investors, because Johnson's reports were
consistent with other research reports from other well respected
research analysts, and because the practice of owning stock in
covered companies was an industry norm at the time of Johnson's
conduct, this substantial risk element is not satisfied. The
Court finds civil penalties in accordance with tier 2 to be
appropriate.

Because the jury found Johnson liable for four
violations of securities fraud, civil penalties will be ordered
for these four violations. On violation 1 as to Redback, the
Court orders $55,000 in penalties. On violation 2 as to
Sycamore, the Court orders $55,000 in penalties. Recognizing

that violations 3 and 4 are with regard to the same company, Corvis, and because the amount of Johnson's pecuniary gain from Corvis was significantly lower than from the other two companies, the Court orders $7,500 of penalties for violation 3, and $7,500 for violation 4. In total, the Court orders $125,000 in civil penalties. Please refer to the Final Judgment annexed to this opinion.

## Conclusion

In addition to the jury verdict finding Johnson liable under § 10(b) and 10b-5, the Court finds Johnson liable, for the reasons discussed above, for violating § 17(a). As relief for these violations, according to the terms of the injunction annexed hereto, the Court enjoins Johnson for a term of 5 years from violating § 10(b) of the Exchange Act, Rule 10b-5 promulgated thereunder, and § 17(a) of the Securities Act; orders that Defendant is liable for disgorgement of $1,868,796 together with prejudgment interest to be calculated as specified in the Final Judgment; and orders Defendant to pay $125,000 in civil penalties.

The Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of the Final Judgment.

SO ORDERED.

Dated:        New York, New York
              July 21, 2006

John F. Keenan

JOHN F. KEENAN
United States District Judge

-26-